Commonwealth v. Clark County National Bank. 151

---

## Commonwealth v. Clark County National Bank.

(Decided December 16, 1919.)

### Appeal from Clark Circuit Court.

1. Escheat—Property Subject to Escheat.—A corporation cannot acquire and hold real property for a longer period than five years unless for a necessary or proper purpose in carrying on its business.

2. Escheat—Good Faith of Corporation.—Where a corporation acquired real property with the good faith purpose of employing it for a necessary or proper purpose in carrying on its business and continues to so hold said property, the five year period fixed by the statutes in which the corporation may dispose of the surplus real property has no application.

3. Escheat—Property Held by Bank to Rent or Sell.—A banking institution which acquires more real estate than is necessary or proper for its purposes in carrying on its business and which it declares by its orders entered on its minute book at the time of the purchase, it owns and holds for the purpose of renting or selling, as to the board may seem best, may own and hold the same not exceeding five years without subjecting the same to escheat to the Commonwealth, under sections 192 of the Constitution and 567 of the Kentucky Statutes.

4. Escheat—Property Subject to Escheat.—Whether real property held by a corporation is subject to escheat after the lapse of five years, largely depends upon the intention of the corporation in acquiring the property and its purpose while it holds it to use the property for some necessary or proper purpose in carrying on its business; and if the corporation becomes the owner of the property with the purpose to resell or rent the same and continues to hold it for more than five years without employing it or intending to employ it for some necessary or proper purpose in connection with its banking business, it is subject to escheat to the Commonwealth.

R. C. OLDHAM, F. H. HAGGER and J. M. STEVENSON for appellant.

PENDLETON & BUSH and J. BENTON for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This action was instituted in the name of the Commonwealth, under section 567 of the Kentucky Statutes, against the Clark County National Bank to escheat a storehouse and lot situated on Main street near the business center of the city of Winchester. It is the property of the Clark County National Bank and was erected in the year 1880 by that institution. It appears that the bank had been in business many years before, and in 1880 decided to find a new location for its business, and accordingly on January 24, 1880, it appointed a committee consisting of its president and certain members of its board of directors "to select a suitable house and see what it could be purchased for and the probable cost of fitting it up, and report to the board on the following Saturday, January 31, 1880." The committee appointed reported, on January 31, that it had found a suitable piece of property commonly known in that city as the Webster House which was "the best and most centrally located," which could be purchased for $5,250.00. A committee was then appointed by the bank

to close the trade and take over the property.  Shortly thereafter a building committee was appointed who obtained the services of an architect, adopted plans and caused a building or two buildings to be erected upon the sixty foot lot which they had purchased from Webster.  The contract was let to the builder as one job, and was completed during the year 1880, the bank taking possession and using its banking house toward the end of that year, and renting the store room to a tenant for mercantile purposes.  The ground occupied had a sixty foot frontage on Main street and extended back something more than 200 feet to an alley.  This suit seeks to escheat to the Commonwealth about twenty-one feet on the north side of the sixty foot lot acquired from Webster upon the ground that the bank had owned and held it for more than five years next before the institution of this action without employing or intending to employ the same for any necessary or proper purpose in carrying on its legitimate business as a banking institution, or of using it in connection with its banking business.

It is the statute law of this state that a corporation may not own and hold real property not necessary and proper for carrying on its legitimate business for a longer period than five years.  Sections 567 and 582 Kentucky Statutes.  These two statutes are based upon a provision of the state Constitution, section 192.  This court in construing the constitutional provision and the statutes has held that where a corporation in good faith acquires real property for a necessary or proper purpose in the conduct of its business and with a *bona fide* purpose to employ the same in carrying on its legitimate business, it may hold such property for a longer period than five years without it becoming subject to escheat. German Insurance Co. v. Commonwealth, 141 Ky. 606; Louisville School Board v. King, 127 Ky. 824; Commonwealth v. Chicago, &c., R. Co., 124 Ky. 497; Commonwealth v. Louisville Property Co., 139 Ky. 689; Commonwealth v. Thomas, 140 Ky. 789; First Nat. Bank of Elizabethtown v. Commonwealth, 143 Ky. 816.

In the case of the German Insurance Company v. Commonwealth, *supra,* in considering a very similar question, we in substance said the Constitution permits a corporation to acquire real property in good faith for

the purpose of using it to carry on its business, and to hold such property with the intention in good faith of using it for such purposes if it shall be necessary for such use when devoted to it, for a longer period than five years without subjecting the same to forfeiture. The time during which the corporation holds real property that is or may be necessary in the conduct of its business without putting it to a proper or necessary use in carrying on its legitimate business, is not the controlling question, but it is largely a question of the *bona fide* intention on the part of the corporation at the time it acquires and during the time it holds, the real estate to employ it in a necessary or proper way in carrying on the business for which the corporation was organized and in which it is engaged. A corporation may own and hold real property for an indefinite length of time beyond the five year period though not for an unreasonable time, if it in good faith acquired the real estate for a necessary and proper purpose in carrying on its business and so holds the property with the good faith intention of employing the same for a necessary or proper purpose in the conduct of its business. In other words it is largely a question of intention on the part of the corporation and its officers, and this intention must be found largely from its conduct as well as from its records through which it alone can speak, but the records alone would not be sufficient, being self-serving, to establish the good faith intention of the corporation to use the real estate in a way necessary or proper to its business, if introduced and relied upon by it, but such a record may be produced to show the want of intention on the part of the corporation to employ the real estate in a necessary and proper way in carrying on its business, and that is the exact situation involved in this case. It is the contention of the Commonwealth that the records of the board of directors of the bank clearly show that the bank did not acquire nor has it since held the property in question for a necessary or proper purpose in connection with its business, and to sustain this contention it cites the only minutes on the record book of the board of directors referring to the acquisition of the property, erection of the buildings and the purposes to which the same were and are devoted. The first order relating to the matter reads as follows:

"Winchester, Ky., January 24th, 1880.

"The board met this day in their banking office. Present: John W. Dean, A. Hood Hampton, James S. Lane, James Hodgkin, A. Howard Hampton and J. W. Parrish. The cashier was requested to read over the loans from a paper held by the bank, which was done and the paper approved. The president then presented before the board a proposition as to seeking a better and more centrally located location for their banking house, believing it to be the interest of the bank to secure a more suitable house and more centrally located for business. After considerable talking upon the matter by the board, the president was requested to and did appoint the following committee, namely: John W. Bean, A. Hood Hampton, M. G. Taylor and V. W. Bush, to select a suitable house and see what it could be purchased for and the probable cost of fitting it up, and report to the board on the following Saturday, January 31st, 1880. There being no further business the board then adjourned.

"JOHN W. BEAN, President.
"M. G. TAYLOR, Secretary."

The next order is as follows:

"Winchester, Ky., Jan. 31st, 1880.

"The board of directors met this day in their banking office. Present were: John W. Bean, A. Hood Hampton, James Hodgkin, A. Howard Hampton and J. W. Parrish. The committee that was appointed at the last meeting reported that after duly considering the matter and looking at several houses and pricing the same that they considered the Webster House as the best and most centrally located, believe the cost of fitting up a good and convenient banking house less than any other place that could be had. That the house and grounds could be bought for $5,250.00. After some consultation it was deemed in the interest of the bank to purchase said property and erect a suitable and nice banking house on the south end of the lot fronting on Main street and a nice store room and business house on the north side, which they can rent or sell as they deem best. V. W. Bush and A. Hood Hampton were ordered to close the trade with Webster at the $5,250.00.

"JOHN W. BEAN, President.
"M. G. TAYLOR, Secretary."

The third order reads as follows:

"Winchester, Kentucky, Feb. 10th, 1880.

"The board met this day.  Present: John W. Bean, James S. Lane, James Hodgkin, A. Hood Hampton, J. W. Parrish and Howard Hampton.  Mr. A. Hood Hampton reported that Mr. Bush and himself, the committee appointed at the last meeting, had purchased the Webster House property at $5,250.00, which purchase was approved by the board.  The board then adjourned until half after one p. m.  The board met this p. m. to hear propositions from Mr. Lewdin as to his price for plans and specifications for building, etc.  At 1:30 p. m., the board met in their banking office when Mr. Lewdin presented a pencil sketch of building and agreed to draw plans and specifications for said building and superintend the building of the same for the sum of $200.00, which proposition was accepted by the board.  John W. Bean, A Hood Hampton and M. S. Taylor were then appointed as the building committee with full power to make and let our contracts.

"JOHN W. BEAN and
M. G. TAYLOR."

For the Commonwealth it is argued that these minutes clearly manifest an intention on part of the board of directors of the bank to build two separate houses, one for banking purposes and the other for a store or other business house, the latter to be rented or sold whichever in the opinion of the board of directors might appear to be best for the institution, and this contention is strongly borne out by the language of the order which reads:

"After some consultation it is deemed in the interest of the bank to purchase said property and erect a suitable and nice *banking house on the south end of the lot fronting on Main street and a nice store room and business house on the north side, which they can rent or sell as they deem best.*"

There is no order or evidence contradicting the purpose of the board of directors thus expressed in that order even up to the time of the taking of the depositions in this case.  The next order respecting the property and its use, after the ones quoted above, was made on January 9, 1917, almost thirty-seven years later, and it reads:

"R. P. Taylor, George Hon, Vic Bloomfield were appointed as a committee of three to get estimates of the cost of remodeling the inside of the office of the bank, and report back to the board of directors.

"S. D. GOFF, President.
"R. P. TAYLOR, Secretary."

Following this and on February 16th, we find an order which reads:

"The following directors were present at a board meeting held in the office of the bank on February 16th, 1917. S. D. Goff, T. G. Barrow, T. W. Brock, W. P. Hampton, A. Howard Hampton, Vic Bloomfield, George Hon, and B. T. Fox. After discussing the notes and condition of the bank a committee was appointed to have an architect draw plans and estimate the cost of erecting office rooms above the bank property and report back to the board. No further business. The board adjourned.

"S. D. GOFF, President.
"R. P. TAYLOR, Secretary."

Before this last order was entered, this suit had been instituted. From a careful reading of the last two orders made by the board of directors, we observe that the committee of three appointed on January 9, 1917, "to get estimates of the cost of remodeling the inside of the offices of the bank and report back to the board of directors" was expected to get estimates and plans for remodeling the offices over the bank proper in the banking building, but not the banking room proper in which the corporation conducted its banking business. This is manifest from the order made by the board of February 16, 1917, in which it says: "A committee was appointed to have an architect draw plans and estimate the cost of erecting office rooms above the bank proper." Mr. Taylor, secretary of the board, testifies that these are the only orders made by the board of directors relative to the acquisition of the banking property and the use to be made of the several properties. He says, however, that the bank contemplated making improvements in the building by enlarging it to take care of its increased business. His evidence upon this point is as follows:

"Q. Has the bank been contemplating any improvement in its building, any enlargement to take care of its

increased business? A. Yes, they have. Q. Has the matter been discussed by the board of directors to your knowledge and in your presence? A. Yes. Q. Why was that? 'A. On account of the crowded condition of the bank. Q. How long has the condition of the bank been crowded? A. Well, at least two years. Q. Is there sufficient room in the banking rooms now occupied by the bank rooms to take care of the business of the bank? A. There is not. Q. How long has that condition existed? A. At least two years.''

He then testifies that in the banking house proper are the offices of the county sheriff and also of a building and loan association, and that in all some seven or eight persons work there. Proceeding with the interrogation the witness was asked:

''Q. State your best opinion and belief as to whether the part of the banking building now occupied by the Bloomfield store (the part in controversy) will be needed, or any part of that, for the enlargement of the banking facilities of the Clark County National Bank? A. If the business continues to increase, it unquestionably will. Q. Would it or not be practical, if you did not have that additional space, to acquire additional space next to the bank that would be convenient for enlarging those banking rooms? A. We have no way of condemning the property adjoining, we would have to purchase. . . . Q. Has there been any definite conclusion by the officers or directors of the bank as to what improvements should be made and additions, if anything, should be made to the banking room and banking facilities? A. No definite arrangements. Q. How long has that matter been under discussion? A. Since last January. Q. Was it ever discussed in the board of directors to that time? A. Not when I was present. . . . Q. Why was that action taken by the board of directors on the first day of January, or early in January, to enlarge the banking room? A. Because we were so crowded that we felt we would have to have additional room. Q. Is the banking business there at the present time too large for the present quarters? A. Yes, sir, it is. Q. Is it practical to occupy any of the second floor with that business? A. Totally impractical. Q. Was that action of the board taken before this suit was instituted? A. It was. Q. Was it before any rumors or information concerning this suit, or

notice was had by the bank of this suit? A. Yes, sir, before any notice."

By his evidence it is further shown that the banking house proper is about thirty-five feet wide and about sixty feet deep, although the lot runs back more than 200 feet. Continuing Mr. Taylor testified:

"Q. Have you made any examination of the books of the bank to see when this property was purchased by the Clark County National Bank? A. It was purchased in 1880. Q. Did you make any examination of the business of the bank at that time to see what were its deposits and what were its loans and discounts in that year? A. Yes. Q. Please state what they were? A. In 1880, June 30th, the deposits were $139,718.00; and loans and discounts were $270,225.00. Q. I will ask you then if you can give us what were the deposits and the loans and discounts in the year 1910? A. June 30th, the deposits were $275,000.00 in round numbers, and the loans and discounts were $580,000.00. Q. Can you give us the deposits and loans and discounts at the close of the year 1916? A. The deposits were $650,362.00, and the loans and discounts were $871,100.00. Q. Can you give us the deposits and loans and discounts at the present time? A. I can of September 4th. Q. What does that show? A. In round numbers the deposits were $949,000.00 and the loans and discounts and bonds were $1,057,796.00. Q. I will ask you to state whether or not the other business of the bank correspond with these figures you have given showing the deposits, loans and discounts bore the same relation to each other? A. Yes, about the same relation. Q. Does that or not show the true condition of the business at those respective periods? A. Yes, it does. Q. Can you state whether or not that growth as shown by the banking figures that you have given, is permanent and substantial? A. We believe it is. Q. What makes you believe that? A. Well, it has been a steady growth from 1910 up. Q. What about the general business of the city and the community in which the bank is located? A. It has greatly improved in the last two years. Q. Did the improvement extend any further back than two years? A. Yes, I think it does, it has been a steady growth, but very much more rapid in the last two years. Q. What would you say about the

future development? A. Well, every indication is that the increase will be as great in the next two years as it has in the past. Q. What is there to justify that opinion? A. Recent developments in the eastern part of our state and the greater increase in population. Q. Can you give approximately the number of inhabitants in Winchester about the year 1880? A. I cannot. Q. Do you know what the population of the city is now? A. Said to be about ten thousand. Q. State whether or not there has been any change in the population, increase or decrease, in the last seven years? A. I think quite an increase in population. Q. To what extent would you say in the last seven years, since 1910? A. Fifty per cent increase, I would think. Q. What about the commercial activity and business done in the city in the past seven years, has it increased or decreased? A. Wonderfully increased. Q. Could you give any proportion of increase during that time? A. Within the last ten years? Q. Seven years? A. Forty to fifty per cent. Q. Has the bank been contemplating any improvements in its building, any enlargements to take care of its increased business? A. Yes, they have. Q. Has the matter been discussed by the board of directors to your knowledge and in your presence? A. Yes. Q. Why was that? A. On account of the crowded conditions of the bank. Q. How long has the condition of the bank been crowded? A. Well, at least two years. Q. Is there sufficient room in the banking rooms now occupied as banking rooms to take care of the business of the bank? A. There is not. Q. How long has the condition existed? A. At least two years. Q. When you first took over the position as cashier in that institution, how many men were you working in there outside of the cashier? A. Four. Q. How many men are you working now, working in those same banking rooms? A. We were working six, we did have seven a little while back. . . . Q. State your best opinion and belief as to whether or not the part of the banking building now occupied by Bloomfield's store will be needed or any part of that for the enlargement of the banking facilities of the Clark County National Bank? A. If the business continues to increase, it unquestionably will. Q. Would it or not be practicable, if you did not have that additional space to acquire additional space next to the bank that would be convenient for en-

larging those banking rooms? A. We have no way of condemning the property adjoining, we would have to purchase. Q. Are any of the adjoining properties on the market? A. I don't know that they are. Q. Are the adjoining properties occupied and used for other businesses? A. Yes. Q. State whether or not they have improvements on them? A. They have. Q. What is the nature of those improvements? A. A drug store on the south side adjoins the bank. Q. What on the north? A. A dry goods store occupied by Vic Bloomfield. Q. Is that immediately north of what is spoken of as the Bloomfield store room? A. Yes, it is immediately north of what you speak of as the Bloomfield store room. . . . Q. Does it or not connect with the part occupied by Mr. Earp with an opening or doorway? A. It does not. Q. Does it connect with the part occupied by Dr. Rees, that is immediately over the front room of the bank? A. It connects by a door. . . . Q. Has there been any definite conclusion by the officers or directors of the bank as to what improvements should be made and additions, if any, to the banking room and the bank facilities? A. No definite arrangements. Q. How long has that matter been under discussion? A. Since last January. Q. Was it ever discussed in the board of directors prior to that time? A. Not when I was present. Q. Was that first started before this suit was instituted or afterwards? A. Before. Q. At the time that was begun did you have any knowledge or any one engaged in the bank have any knowledge that this suit was to be instituted? A. Never heard of it before the notice was served. Q. Are there any vacant spaces in the frontage on the side of Main street where the bank building is located in that entire block? A. Not a one.''

Vic Bloomfield, one of the directors of the bank, testified as follows:

''Q. Prior to the filing of this suit, do you know whether or not any plans have been made by any architect for remodeling the banking house? A. We have only talked about this the first week in January, and I was appointed as committee to get an architect to remodel this banking building. I didn't get any and I went to New York. I sent Mr. Crone to Mr. Taylor and Mr. Taylor told me he had negotiated with two men from Cincinnati, and then I left for New York. Q. No plans

were made prior to the filing of this suit by any archi-
tect? A. I haven't seen any plans, I got   home   last
night. . . . Q. Had Mr. Crone submitted any plans
to you before you left? A. He was measuring walls and
things like that to see what could be done, and I talked
to Mr. Powell just a few days after we made a motion
in the directors' room for fixing the bank, and just a day
or two after that, he suggested to me to tear the whole
building down, both of them, be cheaper than patching
it up, and I agreed with him on that ground. Q. Have
you read that order that was made at that meeting? A.
I haven't seen it, never did see it. Q. Are you willing
to state that that order covered anything except the re-
modeling of the bank building? A. I don't know, I don't
attend to that part of it.  I know the motion was made
and carried to direct me and Mr. Hon and Mr. Taylor to
look after it. Q. Has that committee ever made any
report? A. I don't know if Mr. Hon did, he was away
from here. Q. Any report made at any directors' meet-
ing when you were present? A. I don't know if we had
any directors' meeting since then.  I wasn't there. Q.
Has there been any directors' meeting since that January
meeting when that committee was appointed? A. I think
so—one. Q. When was that? A. In February. . . .
Q. Why was that resolution adopted by the directors
at that meeting that you have referred to in January,
1917? A. Because we needed more room. We had been
talking about it for a long time. Q. How long has this
matter been under discussion by the Clark County Na-
tional Bank? A. For some time. I have been preaching
every two or three months. It's a shame to have a bank
that size in a little hole like that."

It is admitted that the bank has never   used   the
Bloomfield store building in connection with its banking
business through all the thirty-seven years it owned the
same prior to the institution of this action. There is a
solid brick wall extending all the way between the bank-
ing house and the store house and there is no door or
passway between. The three photographs in the record
show the front and back of the buildings. The design of
the front of the banking building is very different from
that of the store building. It appears to be several feet
taller and the floors are not on the same level—the floor
in the bank room being about two feet higher than that

in the store; and in the offices above the floor in that part of the building occupied by the bank is higher than that over the store; the windows in the store building appear to be smaller than those in the banking building and the finish is different; where the two buildings come together there appears to be a well defined mark or indentation; the front of the bank appears to be of stone or concrete, while that of the store building is of brick. The store building has been extended at the rear by several different additions, thus making the store building much longer than the banking house. There is also evidence that the two lots back of the buildings are separated by a wire fence and that they have been treated as separate lots. A blue print is mentioned in the record but does not accompany the evidence. The witnesses in speaking of the buildings referred to them as the store house and the bank; even the officers of the bank in their testimony refer to them as separate buildings. They have been so used through all the years; the store room has been rented apparently all the time for clothing and dry goods purposes. There was no more connection between the bank and the store than between the bank and other stores in that city with whom it did business. From this evidence it is manifest that the bank acquired that part of the lot on which the store house stands only because it could not buy the lot on which it desired to erect its banking house without also purchasing the lot in question, and having become the owner of the lot and having no need for it in connection with its legitimate business, it decided to put it to some use different from that in which the bank was engaged. So it erected the store house, referring to it in its orders as follows: "A nice store room and business house on the north side (of the lot) which they can rent or sell as they deem best." No one can doubt from this order that the bank took the property with the fixed purpose and intention of holding it as an investment only and not to be used in a necessary or proper way in carrying on its business as a banking institution. It immediately began to rent the store house just as indicated by this order and continued so to do up until long after the bringing of this action. It did not use it for a necessary or proper purpose in connection with its legitimate business. There is no way to strain the statutes and the constitutional pro-

visions so as to allow a corporation to purposely take over, own and hold real property not necessary or proper in the conduct of its business for a longer period than five years, although that is exactly what the bank did in this case. It has manifested no other purpose or intention so far as this record discloses than to own and hold the real estate in question for the purpose for which it originally acquired it—to rent or sell. It had five years in which to sell or dispose of this excess property without subjecting it to forfeiture, but it failed to take advantage of the opportunity afforded by the law. In fact, in this case it had much longer than that, because the constitutional and statutory provisions under which this suit is prosecuted did not become effective until long after this property was acquired by the bank and it, therefore, had five years after these provisions became effective in which to dispose of this property. This it failed to do and in so failing it subjected the property to escheat. This appears to be a harsh rule, but it has ever been the public policy in this Commonwealth as well as of all other states of the union to prevent corporations from owning and holding more real estate than was necessary or proper in the conduct of the business for which they were organized. This is well stated in the opinion in the case of German Insurance Company v. Commonwealth, *supra,* where a full discussion may be found. See also Louisville School Board v. King, *supra;* Commonwealth v. Chicago, &c. R. Co., *supra.*

The property sought to be escheated was acquired by the bank with the avowed purpose of building a store house on it for rent or sale, and not to be used in connection with its banking business. It immediately began to rent the store house and to receive the rents. This continued for thirty-seven years before the bringing of this action. The bank had not changed its purpose or intention with respect to the use of the lot and store house in question from the time it acquired it until the bringing of this action, so far as this record shows. It never intended, if we read the evidence aright, to employ the ground on which the store house stands in connection with its legitimate banking business, but only to rent or sell it, as might prove most advantageous. On the 9th day of January, 1917, and only eight days before the

bringing of this action, and no doubt after the bank of-ficials had received information that an escheat suit would be instituted, an order was entered by the directors for the remodelling of the inside of the office of the bank, but no mention was made of a purpose to remove the solid brick wall between the bank and the store room, or of employing the store room or the ground or any part of it on which it stands in connection with the banking business, and it is clear from all the evidence that the corporation did not intend to employ the property in question in its business, but only held it for the purpose of renting or selling it.  The statements of the witnesses Bloomfield and Taylor, the only two connected with the bank, concerning the need of enlarged quarters and a new building, are only the expression of their individual opinion upon the subject and do not reflect the opinion of the institution or its board of directors.  If the question of employing the property sought to be escheated in connection with the banking business was ever brought before the board of directors of the institution, it was rejected, which was an emphatic announcement that the policy of the bank respecting the use to be made of the store house was unchanged and would be in the future the same as it had been in the past.  When the Commonwealth alleged that the bank had owned and held the lot and storehouse in question for more than five years without employing it in its business as a banking institution, and the bank by answer admitted this to be true, it assumed the burden of proving that it held the property for the purpose and with the intention of employing it in connection with the business for which the corporation was organized; and unless it adduced proof to support this burden and to overcome the record evidence of its minute books, it was not entitled to prevail; and having failed in this, its cause should have failed.  It did not produce any concrete probative testimony sufficient to overcome the inferences necessarily drawn from the documentary evidence produced by the Commonwealth, showing the intention and purpose of the banking institution to own and hold the lot and storehouse in question for rent or sale only.  If the institution had manifested an ever present purpose on its part to employ the property in furtherance of its business as a bank, even though it had not actually converted it to

that purpose, the property would not have been escheated. It was not incumbent upon the bank to actually put the property to a use necessary to the conduct of its banking business, but if it in good faith intended to so employ it and there was an apparent necessity for such use, it might have continued to hold the property beyond the five year period without exposing it to forfeiture.

The facts in this case do not bring it within the rule announced by this court in the case of Commonwealth versus Mehlar & Eckstenkenter Lumber Co., 183 Ky. 11, where we said:

"Mr. Mehler, the defendant's president, testified in substance that it is now and has been since the purchase of this lot the settled purpose of this company to establish branch yards in different sections of the city, to enable it to make deliveries to its patrons throughout the city, more promptly and less expensively; that the lot involved in this action, together with another lot subsequently purchased in the same block and facing the same street with but seventy-five feet intervening between the two, was being held by the company in pursuance of said policy, with the ever present intention of using these lots in connection with other property to be acquired adjacent thereto, as a branch lumber yard in that section of the city, for which purpose this property is peculiarly adapted; that the company had not sooner completed its design with reference to the lot in question, although it is at present engaged in improving property for use as a branch yard in another section of the city, because of the temporary depression in its business during the period immediately preceding the war, and the abnormal cost of material since the beginning of the war; that its business in this section of the city approximates $8,000.00 a year; that the company is a "close" corporation, having only about nine stockholders, all or most of whom are related; that the meetings of its directors have been infrequent, and that the minutes of these meetings do not furnish a record of any considerable part of the transactions of the company; that he, as the president and sole executive officer, has for about twenty years, managed, developed and protected the company's business, in accordance with the wishes of the directors as expressed in informal discussions, rather than in formal orders of the board. This evidence in our judgment under the circumstances, was competent evidence to

prove the intention of the company in holding the lot in question for a longer period than five years, and was substantial proof, and not being contradicted, sufficient to sustain the defendant's plea, that it was holding the lot in question 'in anticipation of its future use for a legitimate corporate purpose with an ever present purpose to devote it to such use."

In the Mehler case the uncontradicted evidence showed that the corporation purchased and held the lot in question with the settled purpose to employ it in its regular business and that the lot as well as others owned by the company was being held by the company in pursuance of said policy and "that there was an ever present intention of using these lots in connection with other property to be acquired adjacent thereto as a branch lumber yard in that section of the city."

In the case at bar just the opposite is proven. The property was acquired and held for the purpose of renting or selling, and not to be employed in its regular business, and there was never "an ever present purpose" to use the property for any necessary purpose connected with the bank, and the rule applied in the Mehler case cannot therefore be applied in this case.

It is insisted that the land sought to be escheated was acquired by the bank before the adoption of the present state Constitution in 1891, and, therefore, the corporation had a vested right which was unaffected by the adoption of the new Constitution and the enactment of section 567 Kentucky Statutes; that there could be no impairment of the obligation of contract or rights acquired and vested before the making of the law. This constitutional question was considered in the case of Germania Insurance Co. v. Commonwealth, *supra,* where we said:

"It may also be here noted that although the Constitution of the United States forbids any state from impairing by constitution or law the obligations of a contract, there is yet the exception to this general rule that the state cannot contract away its police power or its right to abrogate or annul contracts it has made in contravention of this power. And, so, although the state may have entered into a contract that would ordinarily be binding upon it, and beyond its power to impair, it may yet avoid a contract so entered into, if by

the contract the state undertook to part with its police power. A full exposition of the extent of the right of the state under this power to impair or annul contracts that it has entered into will be found in Bacon v. Walker, 204 U. S. 311, 51 L. Ed. 499; Chicago B. & O. R. Co. v. Illinois, 200 U. S. 561, 50 L. Ed. 596; Holden v. Hardy, 169 U. S. 366; 42 L. Ed. 780; New Orleans Water Co. v. Rivers, 115 U. S. 674, L. Ed. 525; Stone v. State of Mississippi, 101 U. S. 814, 25 L. Ed. 1079. And upon the principle announced in these cases, counsel for the Commonwealth relies, and in argument insists, that even if it should be ruled that the charter of the insurance company conferred upon it the right to hold property not needful for its use for longer than five years that the grant of this unlimited power did not constitute an inviolable contract upon the part of the state, and under its police power it might at any time withdraw the grant. There is much that might be said in support of this proposition, but we do not deem it necessary in order to sustain the contention of the Commonwealth to rest or attempt to rest upon this ground its right to the relief sought. We think that the case for the Commonwealth may safely and soundly be put upon the ground also relied on by counsel that the charter contract of the company was not impaired by the subsequent constitutional provision or statute before cited. In other words, our opinion is that the provision in the charter relied upon does not confer upon the company the right to hold for a term longer than five years, or indeed for any time, real property not "needful to transact and manage the business of the insurance."

It is said by appellant that as this is a national bank, organized under the laws of the United States and not of this state, its property is not subject to escheat under the laws of Kentucky, but with this contention we cannot agree. There is nothing in the nature of a national bank which will prevent a state from providing for the escheat of lands taken by the bank to secure a debt, after they have been held for the five year period allowed by the federal banking law. 10 R. C. L. 608. The same author in vol. 3, page 657 says:

"It has been held that in view of the fact that the national banking act prohibits a national bank from holding for more than five years real estate purchased to

secure any debts due it and not necessary for its immediate accommodation in the transaction of its business, a state statute providing for the escheat to the state of all real estate held by banking corporations without authority for a longer period than five years is not invalid as applied to national banks as an unlawful interference with the operations of the bank.''

This text is largely rested upon the case of the First National Bank v. Commonwealth, 143 Ky. 816. An editorial note appended to the opinion in the above styled case in 34 L. R. A. (N. S.) 55, says: "An extended search for additional cases adjudicating the question whether a state has the right to escheat land held by a national bank confirms the statement that First National Bank v. Commonwealth is one of first impression. The decision seems to be correct. There is no conflict between the Federal Statutes and Kentucky law with reference to the period of time a national bank, on the one hand, and all corporations, on the other, shall be allowed to hold land for such a purpose as it was held for in the case at bar. It was upon this fact that the decision was made to turn.''

The Supreme Court of the United States in Mc-Clelland v. Chipman, 164 U. S. 347, held in substance that as national banks are subject to the laws of the state in which they operate and are governed in their daily course of business more by the laws of the state than of the nation, they must conform thereto. Proceeding the opinion says: "Their (banks) acquisition and transfer of property, their rights to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.''

In the case of the First National of Elizabethtown v. Commonwealth, *supra,* we held in substance that national banks cannot hold real estate not necessary in the conduct of their business beyond five years, and the protection afforded by the congressional act, ends when the five years expire, and thereafter the state laws become effective, and lands held for a longer time than five years by a national bank not to be used in connection with its business, are subject to escheat under the Constitution and statutes of the state. This conclusion is sustained by numerous authorities therein cited,

It has several times been held by this court that a banking institution or other corporation may acquire and own sufficient real estate upon which it may erect a building of any number of stories, and rent to others that part of the building which it does not need for its legitimate business and not violate the law when it has held the surplus building for more than five years, especially where it contemplates the future need of the space to accommodate its increased business. If in acquring the property the corporation did so with the *bona fide* intention of using it for a necessary or proper purpose in carrying on its business, and it reasonably appears to be necessary or will soon become so, the property may be held for a period much longer than fixed by the statutes; and we have further held that the law of escheat is not directed at unnecessary buildings owned and held by corporations but as real estate proper —land owned and held by them for a purpose not necessary or proper in the conduct of their business. No matter how tall a building may be erected upon a lot, which in itself is not more real estate than the corporation can reasonably employ in carrying on the business for which it was organized in a proper way, it is not subject to escheat.

All of the lot in question occupied by the store building for more than five years next before the commencement of this action, as well as that part of the lot back of the building laid off to the storeroom, were subject to escheat at the time this action was commenced, and the trial court should have so held. The center of the solid brick wall which divides the store room from the banking house is the line at which the property should be severed for the purpose of forfeiture. That part of the building north of the solid brick wall between the bank and the storeroom as well as that part of the ground which lies back of the storeroom, occupied for the five years before the institution of this action, is and should be escheated to the Commonwealth, and upon a return of the case to the lower court a judgment will be entered forfeiting said property to the Commonwealth, and for further proceedings in conformity to this opinion.

Whole court sitting. Judges Clarke, Thomas and Quin dissenting.