## Posten v. Commonwealth.

(Decided October 16, 1925.)

### Appeal from Warren Circuit Court.

1. Criminal Law—Although no Other Witnesses are Present, Jury is Not Bound to Accept Version of Accused Testifying for Himself. —In murder case, although no other witnesses were present at time of killing, jury is not bound to accept version of accused, who testified for himself.

2. Homicide—Evidence Held to Sustain Conviction for Voluntary Manslaughter.—Evidence of circumstances surrounding shooting of deceased held to sustain conviction for voluntary manslaughter.

GARDNER, OLIVER & DIXON for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On a Tuesday night in August, 1924, between eight and eight-thirty o'clock p. m., in the city of Bowling Green, the appellant and defendant below, Herman Posten, shot and killed Leslie Turner, a colored man, for which he was indicted and charged with murder. Upon his trial he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of twenty-one years. The court overruled his motion for a new trial and from the judgment pronounced on the verdict he prosecutes this appeal and relies for a reversal solely upon the ground that the proof heard upon the trial was insufficient to sustain the verdict and that his motion for a peremptory instruction of acquittal should have been sustained; or, if not, that the verdict is fla-

grantly against the evidence. It is expressly conceded by his counsel in their brief that in all other respects the trial was free from error.

The appellant is a white man and deceased was porter for a hotel in the city of Bowling Green. Close to the hour of eight o'clock on the fatal evening defendant went to the rented residence of the deceased (who was living alone), for the purpose, as he said, of collecting a debt owed him by the deceased amounting to $40.00. He says that a short time prior thereto deceased borrowed from him $40.00 and agreed to pay within the stipulated time, which had expired, $10.00 for the use of it, and that at the time deceased owed him $50.00. No note or any memorandum of that indebtedness was made and no witness proves it except defendant. Two witnesses saw defendant and deceased at the latter's house until their departure in the latter's automobile about twenty or thirty minutes after defendant's first arrival there. It is not clear whether defendant, during that time, went into the house of Turner, but if he did it was only momentary, since he is shown to have remained outside of the house either on the pavement or on the porch of the residence of deceased until the latter started away in his automobile, which was standing immediately in front of his house; that deceased cranked his machine and got into it in the front of the wheel on the left side and requested the defendant, in substance, to get in and take a seat with him, when defendant said, "No, I will ride on the running board." They had driven on that (Adams) street some two or three hundred feet and had passed over an elevation in the street when four or five shots were heard, and almost immediately the witnesses for the Commonwealth, who testified as above, and a number of others gathered at the scene of the shooting. The automobile, which was driven by the deceased, had run into the yard of the dwelling of another witness for the Commonwealth and had run against an automobile parked in that yard and stopped. Two witnesses, who were on the porch of that residence, saw the shooting and testified that it was done by some one standing on the running board of the machine coming towards the house, but a short distance away. Two other witnesses, who were sitting on the dump of the railroad on the opposite side of the street, corroborated the first two. Deceased was dead, or practically so, and was holding the wheel with his left hand and his right one hanging by his side

limp, he having been shot in that arm, from the effects of which it was broken. His feet were on some of the running gear of the automobile, with his head resting upon the wheel. He was shot four times, each of which, except the one in his arm, was in his side or back and produced serious and dangerous wounds. Immediately after his body was lifted out of the automobile, witnesses examined the bottom of the bed and found some empty hulls from defendant's pistol, the crank of the machine and some greasy rags, which were removed, but nothing found under them. Within a very short time the policemen arrived and they critically examined with matches and flashlights the bottom of the automobile and found nothing more than what is above stated, and they positively said that no knife was there. After the lapse of about thirty minutes and after the body of the deceased had been removed out of the automobile and within a short time a great number of people had congregated, the automobile was driven by a colored boy from that place and stopped at the city fire department and the police headquarters. Directly thereafter a fireman, who, according to the testimony, had theretofore driven a taxicab, as was also the business of defendant, testified that he found a long-bladed knife in the automobile lying right next to the clutch or brake, and which of course could easily have been seen by those who examined the same spot immediately after the killing. The knife that the witness claimed to have so found was open, with a keen point, the blade perfectly bright with no blood on it. The Commonwealth also proved by a witness, who is not impeached, that some weeks before the homicide witness had a conversation with defendant at a designated place in the city and that the latter inquired of witness if he had seen the deceased and was informed that deceased had "just passed me (witness), going up town," whereupon defendant said, "I want to see him," and witness asked him "For what purpose?" and received from defendant the answer, "He owes me for some stuff and he can't buy my whiskey from me and not pay me," When the witness said, "Oh, he will pay you," and then defendant replied, "He has got to pay me; he had better pay me tonight," and threatened to kill him if he would not do so. It was also proven by the Commonwealth and not denied by defendant that he immediately fled from the scene, and when an officer approached him about an hour later he ran into a corn field, and something like an hour

and a half after the homicide he was captured. At the time of his arrest one of his ankles was freshly sprained and he had some bruised places and streaks on his right side extending from the belt up to under his arm, and on his breast was a slight wound extending barely through the cuticle, which was round and about the size of a lead pencil, with jagged edges, and there was a corresponding hole in his shirt, with raveled and jagged edges, and that wound, defendant claimed, was inflicted on him by the deceased with a knife; and this was in substance the testimony introduced by the Commonwealth, with the exception of the finding of the knife in the automobile by the fireman who was introduced by defendant.

Defendant testified that he went to the house of the deceased for the purpose of collecting his debt and that Turner told him that he had some money in the house but not enough to pay it and asked defendant to go with him to some place on Center street to get the remainder of the amount due; that he agreed to that and that deceased got into the machine; when he did so he carried with him an open knife and put it under his right leg, and for that reason he (defendant) declined to take a seat by the side of deceased. He says that directly after they started he concluded to and did get off of the running board and sat on the seat by the side of the deceased, and that while he was making the change in position the automobile was stopped to enable him to do so; that as soon as he took his seat he asked deceased, "What are you going to do with that knife?" and immediately deceased reached for and obtained the knife and said, "G— d— you, I am going to show you," and commenced to strike at him, whereupon he shot deceased in his necessary self-defense, and that he received the wound in the breast above described in the melee. He also testified that some week or ten days prior to the fatal evening he made another visit to the residence of deceased for the purpose of collecting his money and that Turner went to his washstand and took therefrom a pistol and said, "I will pay you when I get G— d— good and ready," whereupon defendant left and went to the police station and stayed all night because, as he said, he was frightened and afraid of deceased. Notwithstanding such fright he met deceased the next morning and informed him that he was going to the chief of police for the purpose of instituting proceedings to collect his money, when the deceased requested him not to do so because he expected to pay him soon. He

also proved by a witness that deceased had previously made some sort of threat against him, but that testimony, like some given by defendant, was exceedingly incongrous and does not harmonize with usual and ordinary human conduct.

The Commonwealth, to refute defendant's testimony about the wound in his breast having been made by deceased with a knife, not only proved the condition of the wound and the hole in defendant's shirt, but likewise proved by two reputable physicians, who examined the wound, that it was impossible for it to have been made with the knife claimed to have been found in the automobile or with any other sharp instrument. On the contrary, they testified that it was made with some sort of blunt instrument coming in contact with defendant's body at that point. The bruises on defendant's body, he says, were made when he was fleeing from the scene and going between two freight cars by his foot slipping and his falling in some manner and rubbing or brushing against some of the couplings or attachments of the cars, and at which place, we may add, he might also have received the jagged and bruised wound in his breast.

We have given, in substance, all of the testimony heard upon the trial, and in all candor we must say that it is difficult for us to understand how it can be seriously contended that the verdict is even flagrantly against the evidence. However, as a basis for that argument, it is earnestly argued that since defendant testified to the facts that occurred at the immediate time of the killing and that no other witness was near enough to hear any of them or see all that occurred, his testimony should be accepted as absolutely true. That argument, however, loses sight of the fact that this court has reiterated the rule in a number of cases that the jury ''was not required to accept his (defendant's) statement as to what occurred when he and Price (deceased) were the only persons present, especially in view of his self-interest and the fact that he was contradicted on other points.'' Johnson v. Porter, 208 Ky. 390. The case of Estepp v. Commonwealth, 187 Ky. 156, is cited in that opinion in support of the rule, and we again approved it in the cases of Simmons v. Commonwealth, 207 Ky. 570; Wilson v. Commonwealth, *idem* 707, and Spicer v. Commonwealth, 209 Ky. 395. However, in the Wilson case there were no facts or circumstances having a *tendency* to contradict the testimony of every witness who testified in the case, both

for the prosecution and the defense, and in holding that the verdict was flagrantly against the evidence, after stating the rule as announced in the other cases cited, we said in that opinion: "But no such case is here presented, and broad as is the province of the jury in such matters we have never held that they may disbelieve all the witnesses and ignore all their evidence because of the apparent improbability of the story they tell and adopt another theory *equally,* if not *more, improbable* and based almost entirely, if not altogether, on *mere suspicion.*" (Our italics.) We have no such case presented by this record as was manifested in the Wilson case. There are a number of circumstances contradicting the testimony of the defendant as to what occurred immediately at the time of the shooting as well as the fact that deceased started from his residence with an open knife. There is the threat of deceased, which, however, he denied; the utter improbability of his version of what occurred both at the time of the homicide and at the time when he made his first visit to the residence of deceased to collect his money. He is also contradicted upon the fact that the automobile stopped before it ran into the yard and against another automobile therein; the position of the body of deceased at the time likewise contradicts his testimony. It is also passingly strange that defendant was afraid to take his seat by the side of the deceased when he started, because of the presence of the supposed knife, and yet became courageous enough to do so before the short trip was finished, and it was equally strange that deceased would become so suddenly angered at being asked for his reasons for carrying the knife that he would attempt to murder the defendant. Likewise, it should not be overlooked that defendant fled and was not captured for the space of about one and a half hours and only then after being surrounded by officers. He is also contradicted as to what produced and how he received the wound in his breast; and yet another strange circumstance, which is inconsistent with other parts of his testimony, is that he went to the home of the deceased alone in the nighttime, armed with a pistol, after stating that he was afraid of the deceased except in the daytime, during which he had ample opportunities to endeavor to collect his debt. If he had desired to do the deceased no harm, his peaceable course would have been to approach him, unarmed, in the daytime if he was afraid of him at night, as he said he was.

From a careful reading of this record we are con-vinced that this case comes under the rule announced in the Porter and Spicer cases, *supra,* and that the facts and circumstances which we have narrated sustained the jury in discrediting defendant's testimony as to what happened at the precise time of the killing, since the proven circumstances have a strong tendency to contra-dict it and to show that the homicide, instead of being committed in the exercise of the defendant's right of self-defense, was done at least in sudden heat and pas-sion, if not with malice aforethought. Evidently the jury thought so, else they would not have inflicted the maxi-mum punishment for manslaughter. Their verdict rather indicates that they were impressed with the fact that the homicide was an aggravated one and we are not pre-pared to say, from a careful reading of the record, that they were mistaken in so believing.

It results that we are not unauthorized to reverse the judgment because of the insufficiency of the evidence to sustain it, and it is accordingly affirmed.